IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**HECTOR ZABALA-DE JESUS**, *et al.*,
    Plaintiffs,

v.

**SANOFI AVENTIS PUERTO RICO, INC.**, *et al.*,
    Defendants.

Civil No. 15-1803 (BJM)

## OPINION AND ORDER

Alleging age discrimination, Hector Zabala-de Jesus ("Zabala"), Dolly Ann Rivera-Roman, and the Conjugal Partnership Rivera-Zabala brought this action against Sanofi Aventis Puerto Rico, Inc. ("Sanofi PR") and Sanofi US Services, Inc. (collectively, "Sanofi") under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, Puerto Rico Law 100 ("Law 100"), P.R. Laws Ann. tit. 29, § 146, and Article 1802 of the Puerto Rico Civil Code ("Article 1802"), P.R. Laws Ann. tit. 31, § 5141. Docket No. 10. Sanofi moved for judgment on the pleadings, and on March 13, 2017, I dismissed plaintiffs' state law claims. Docket No. 35. Sanofi now moves for summary judgment on plaintiffs' remaining ADEA claim, Docket Nos. 55, 79, and plaintiffs opposed, Docket Nos. 63, 82. The case is before me on consent of the parties. Docket No. 15.

For the reasons set forth below, the motion for summary judgment is **GRANTED**.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it

believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## BACKGROUND

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56[1] submissions.[2]

---

[1] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record, that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). While the district court may "forgive" a violation of Local Rule 56, litigants ignore the rule, which is meant to prevent the court from ferreting through the evidentiary record, "at their peril." *See Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

[2] Sanofi's Statement of Uncontested Facts ("SUF"), Docket No. 54-1, and Zabala's Opposing Statement of Facts ("OSF"), Docket No. 64. Sanofi contends the OSF did not strictly comply with Local Rule 56, though it acknowledges that most of the SUF's facts were admitted by the OSF. To the extent some of the lengthier statements in the OSF violate Local Rule 56(c), I find that it is appropriate to excuse this violation for four reasons. *See Mariani-Colón*, 511 F.3d at 219. First, because the OSF admits most of the facts in the SUF, there are not too many statements in the OSF that are actually in question. Second, while Sanofi is correct that some of the statements in the OSF are unresponsive to the SUF's statements, many of the statements in the OSF actually do "qualify" the statements in the SUF. Third, because Zabala's opposition to the summary judgment motion highlights many of the statements in the OSF, Sanofi can hardly claim that it is unaware of, or surprised by, the factual issues that are in dispute. Fourth, Sanofi elected not to file a reply statement of facts, leaving uncontested many of the facts brought to light in the OSF.

Sanofi is a global life sciences company that manufactures and markets pharmaceutical products in, among others, diabetes, oncology, renal, hematology, and bio-surgery as well as medical devices. SUF ¶¶ 1, 29. Sanofi hired Zabala on April 1, 1997 as a Product Manager for principally cardiovascular products but also anti-infective and injectable products. SUF ¶¶ 2, 5, 9. In 2000, Zabala became a Marketing Manager where he did similar work but also managed more products, including urology products. SUF ¶¶10-11. In 2003, Zabala was promoted again to Senior Marketing Manager. Although he worked with multiple products, his principal focus was on three cardiovascular pharmaceuticals, Plavix, Avapro, and Avalide. SUF ¶¶ 7, 13.

Until they lost their patent protection in 2012, the cardiovascular products that Zabala managed accounted for 70% of Sanofi PR's sales. SUF ¶ 21. Zabala managed fifty sales representatives dedicated to cardiovascular products by managing their sales budgets, designing the marketing strategies, and ensuring proper implementation of those strategies by the sales representatives. SUF ¶ 23; OSF ¶ 23. Zabala knew that Plavix, Avapro, and Avalide would lose their patent protection in 2012 and that the loss would lead to a significant reduction in investment by Sanofi in those products. SUF ¶¶ 24, 27-28.

Once Sanofi switched away from cardiovascular products in 2012, Zabala was reassigned to be the Senior Marketing Manager of the Specialty Business Unit, which included oncology, renal, hematology, and bio-surgery products, and medical devices. SUF ¶¶ 29, 32. He was supervised by Waleska Rodriguez, who was Director of the Specialty Business Unit. SUF ¶ 34. As part of the Specialty Business Unit, Zabala managed four sales representatives and oversaw products that represented 18.2% of Sanofi PR's marketing budget for 2012. SUF ¶¶ 35-36. This was projected to decrease significantly by 2014. SUF ¶ 87. He knew that the Specialty Business Unit would not continue to grow in sales in 2014 and that it therefore would not need a higher marketing budget. SUF ¶ 88. He also knew that the Specialty Business Unit was not launching any new products in 2014.

Sanofi PR conducted mid-year and year-end evaluations. SUF ¶ 51. As part of the year-end evaluations, an employee's supervisor rated each employee with an overall rating between one and

Zabala-de Jesus, *et al*. v. Sanofi Aventis Puerto Rico, Inc., *et al*., Civil No. 15-1803 (BJM)                                4

nine based on Sanofi's 9-Box Grid System. SUF ¶¶ 49, 51, 53. In 2010, Zabala received an overall performance evaluation of seven, which meant that he exceeded expectations regarding his priorities and results but did not demonstrate the expected behaviors and competencies. SUF ¶¶ 52-53. In 2011, Zabala received an overall performance evaluation of five, which meant that he met expectations regarding his priorities and results and demonstrated expected behaviors and competencies. SUF ¶¶ 56-57. In 2012, Zabala received an overall performance evaluation of one, which was the lowest possible score and meant that he was below expectations regarding his priorities and results as well as behaviors and competencies. SUF ¶¶ 60-62. Zabala contested the validity of his low evaluation at the time, but he conceded that it was at least in part related to the fact that the sales representatives were unsatisfied with how he had managed new products. SUF ¶ 63; OSF ¶¶ 60, 63. In 2013, Rodriguez gave Zabala an overall performance evaluation of four, which was taken into account when deciding to fire him, although the evaluation was not yet finalized. SUF ¶¶ 67, 72.

Sanofi hired Brenda Bonet as a Marketing Manager of diabetes products in 2007. SUF ¶ 45. Brenda Bonet provided marketing support and supervised thirty-five sales representatives in the Diabetes Business Unit, and she was supervised by Angela Febles, the Director of the Diabetes Business Unit. SUF ¶¶ 41, 43, 45. In 2012, the Diabetes Business Unit generated the majority of Sanofi PR's sales and therefore had the largest marketing budget. SUF ¶ 40; OSF ¶ 40. By 2013, diabetes products accounted for close to 80% of Sanofi PR's sales, and they were prepared to launch a new product in 2014. SUF ¶¶ 76, 90. From her work in diabetes products, Bonet had an excellent relationship with endocrinologists in Puerto Rico, which constitute a small and closed circle of doctors, and with the Endocrinologist Association. SUF ¶ 48. In 2010, Bonet received an overall performance rating of four, which meant that she was meeting expectations regarding her priorities and results but did not demonstrate expected behaviors and competencies. SUF ¶¶ 54-55. In 2011 and 2012, Bonet's overall performance rating was eight, which meant that she exceeded expectations regarding her priorities and results and demonstrated expected behaviors and competencies. SUF ¶¶ 58-59, 65-66. In 2013, Bonet had not received her final evaluation

before Zabala was fired, but Febles gave Bonet an overall performance evaluation of five, which was taken into account when deciding whether to select her for a new role. SUF ¶ 69.

In August of 2013, Sanofi PR hired David Freeman as its General Manager and Vice President. SUF ¶ 73. Soon after, Freeman began an assessment of how to restructure Sanofi PR. SUF ¶¶ 77, 80. Freeman analyzed the Diabetes Business Unit and the Specialty Business Unit, future products for Puerto Rico, and the life cycle of those products; he met with the Business Unit Directors, the Finance Director, the Market Access Director, Febles, and Rodriguez; and he conducted a business review where Febles and Rodriguez and their sales teams, including Zabala, presented their business units, the sales of their units, the investments they were making in sales and activities, and the projections for future sales performance. SUF ¶¶ 81-86.

After his assessment, Freeman created his Initial Assessment Findings, which identified the need to reorganize Sanofi PR. SUF ¶¶ 92-94. Freeman began working with Adriana Bury, Human Resources Business Partner Director in the Global Services Division, to reorganize Sanofi PR including eliminating positions and creating new positions. SUF ¶¶ 95-96, 98. In October 2013, Sanofi approved Freeman's proposal to create a Product Manager focused on diabetes products and a Business Intelligence Manager. SUF ¶ 101. Febles and Bonet recommended that Freeman create the Product Manager position to support the launch of new diabetes products. SUF ¶ 102. Freeman told Bury that the Product Manager would provide the "Diabetes Marketing Manager (Brenda Bonet)" supervisory experience so that she could be developed into a Senior Marketing Manager in 2014. OSF ¶ 101. All Sanofi PR employees received an email about the new Business Intelligence Manager position opening on November 4, 2013 and November 6, 2013. SUF ¶¶ 110-11. Zabala did not apply although he had applied for other job openings at Sanofi PR in the past. SUF ¶ 112. Although Zabala was not interested in the Product Manager position, he would have been interested in the Business Intelligence Manager position if it had been offered to him at the time that he found out that his position as Senior Marketing Manager of the Specialty Business Unit was being eliminated. SUF ¶¶101, 161; OSF ¶ 110.

Freeman then created a document titled, *Sanofi Puerto Rico Organizational Assessment and Recommendation*, which he presented to his boss and Bury on or before November 14, 2013. SUF ¶ 103; OSF ¶ 103. In the document, Freeman suggested getting rid of the Specialty Business Unit and merging it with the Diabetes Business Unit to create a new consolidated Business Unit. OSF ¶ 103. He listed Bonet as the Marketing Manager for the newly-expanded Business Unit and listed Febles as the Director of the same, preferring Bonet because "her expertise in diabetes and proven record and capabilities in the diabetes market." *Id*.; SUF ¶ 125.[3] He also listed Orlando Zavala as the Business Intelligence Manager (although Zavala turned out to not meet the requirements, and someone from outside the company was hired instead). SUF ¶ 108; OSF ¶ 101. Rodriguez and Zabala, previously both with the Specialty Business Unit, no longer appeared on the organizational chart. OSF ¶ 103, 123.

After receiving Freeman's organizational assessment, Bury reached out to Freeman asking to meet with him the week after to "talk about the restructure and approach for specialty;" they met on November 11, 2013, and discussed the plan to consolidate the two units. SUF ¶¶ 114-15. Bury told Freeman that the plan to reduce the workforce and eliminate positions would need to be cleared by Sanofi's legal team. SUF ¶ 117. Bury and Freeman exchanged emails agreeing to speak again about the consolidation plan and later spoke about the qualifications necessary for the two new consolidated roles. SUF ¶¶ 118-22. They agreed that the two main criteria for selection would be expertise in the diabetes market and past performance. SUF ¶ 122. As noted above, at this point, Freeman had already identified Bonet and Febles as his two preferred candidates. OSF ¶ 122. Bury and Freeman agreed that Febles should be recommended as the new Director because of her expertise in diabetes, her record as Director of the Diabetes Unit, and her seniority because that

---

[3] Although Zabala ostensibly denied this statement of uncontested material fact, his denial and record citations focus entirely on a separate hiring decision by a separate committee for a separate position, namely the unanimous selection of Nelson Hernandez over Dulce Fuentes for Product Manager by a panel of Sanofi US and Sanofi PR officials. *See* OSF ¶ 125; Docket No. 79-3 (email from Susan Lloyd, Sanofi US's Senior Staffing Consultant, explaining that although Fuentes had more experience in diabetes products sales, she did not have the necessary marketing experience for the job). As he failed to deny the fact with relevant record citations, this fact is deemed admitted. *See* D.P.R. Civ. R. 56(e).

reduced legal risks under Puerto Rico severance law. SUF ¶¶ 123-24. Before agreeing to Freeman's choice for the new Business Unit Marketing Manager, though, Bury said that she wanted to review the marketing responsibilities, experience and capabilities, and performance ratings of Bonet and Zabala. SUF ¶ 126.

To facilitate Bury's review of the two candidates, Freeman asked Febles (Bonet's direct supervisor) to prepare a comparison of Zabala and Bonet, focusing on their background and experience. SUF ¶ 127. The comparison of the two candidates that Febles emailed Freeman on November 21, 2013 was very detailed and favorable as to Bonet and occasionally incorrect and under inclusive as to Zabala. SUF ¶¶ 129-31; OSF ¶ 130. Febles told Freeman that there was some information missing from Zabala's description, and Freeman told her that Human Resources could fill in the rest; Freeman then forwarded the information on to Bury after adding a couple more lines of information about both candidates. SUF ¶¶ 132-33, 138-39. He did not ever review the full performance evaluations for the candidates, just the overall performance rating. OSF ¶ 114. In Febles's original email to Freeman, she included that Bonet is a woman over 40 years old but did not reference Zabala's gender or age. SUF ¶ 134. She explained in her deposition that she thought it was relevant that Bonet was a member of two protected classes; however, she did not know Zabala's age. SUF ¶¶ 134-35. When Freeman forwarded the information to Bury, he changed Febles's note from woman to female and added under Zabala's description that he is a male over 50. SUF ¶ 139.

Bury reviewed Zabala and Bonet's qualifications. She reviewed the performance evaluations of both candidates from 2010-2012. SUF ¶ 141. She also accessed the 2013 performance evaluations of both candidates as completed by their supervisors because although they were not officially submitted yet, both supervisors had already uploaded their year-end reviews into the system. SUF ¶¶ 141-42. In early December 2013, Bury told Freeman that based on her assessment of their performance evaluations as well as the information provided by him and Febles, she agreed with his recommendation to fire Zabala and make Bonet the new Marketing Manager of the consolidated unit. SUF ¶¶ 143-44. Bury did not consider Zabala's performance

evaluations from before 2010 or the specifics of Zabala's successes while managing the cardiovascular products. SUF ¶ 141; OSF ¶ 130. She also did not consider the fact that Zabala had some experience with diabetes products because two of the cardiovascular products that he managed were also "indicated for treatment for diabetic conditions." OSF ¶ 122. By December 20, 2013, having completed several internal human resources checks and obtaining clearance from the Sanofi legal team, Bury officially approved Freeman's consolidation plan. SUF ¶¶ 145-46.

Freeman and Bury met with Zabala on January 8, 2014 to tell him that he would be fired as of February 7, 2014. SUF ¶ 150. This was the same day that Freeman announced the consolidation to the entire Sanofi PR staff. SUF ¶ 149. After becoming the Business Unit Marketing Manager, Bonet resigned from Sanofi PR in July 2014. SUF ¶ 162. The new Business Unit continued without a marketing manager for eight months until Sanofi PR hired Olga Hernandez who brought more than eight years of experience in diabetes marketing with one of Sanofi PR's main competitors. SUF ¶¶ 163-65; OSF ¶ 147.

While an employee at Sanofi, Zabala went to school to get a Master's Degree in Marketing, but he was unsuccessful. SUF ¶¶ 15, 18-19. Bonet had a Master's Degree in Business Administration as did her replacement, Hernandez. SUF ¶¶ 47, 167.

Zabala was born in 1958, and Bonet was born in 1969. SUF ¶¶ 3, 157. Rodriguez was born in 1961, and Febles was born in 1960. SUF ¶¶ 155-56.

## DISCUSSION

Sanofi contends that summary judgment is appropriate as to Zabala's ADEA claim. Docket Nos. 55, 79. Zabala responds that summary-judgment adjudication is improper as to his claim because it is riddled with genuine disputes of material fact. Docket Nos. 63, 82.

The ADEA "provides that it is unlawful for an employer to 'refuse to hire or to discharge any individual or otherwise discriminate against [him] with respect to his compensation, terms, conditions, or privileges of employment, because of such . . . individual's age.'" *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 137–38 (1st Cir. 2012) (quoting 29 U.S.C. § 623(a)(1)). Broadly speaking, this statute "protects persons 40 years old or older from age-based employment

discrimination." *Martinez-Rivera v. Commonwealth of P.R.*, 812 F.3d 69, 78 (1st Cir. 2016). To assert an ADEA discrimination claim, a plaintiff "has the burden of establishing 'that age was the 'but-for' cause of the employer's adverse action.'" *Acevedo-Parrilla*, 696 F.3d at 138 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)). This showing does not require the plaintiff "to proffer direct evidence of discrimination," as a plaintiff "may meet his burden through circumstantial evidence." *Acevedo-Parrilla*, 696 F.3d at 138. "Where, as here, the employee lacks direct evidence," courts "utilize the burden-shifting framework developed by the Supreme Court to facilitate the process of proving discrimination."[4] *Cruz v. Bristol-Myers Squibb Co., P.R.*, 699 F.3d 563, 570 (1st Cir. 2012). This three-step burden-shifting framework was established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

A prima facie case of age-based discrimination is established under the *McDonnell Douglas* burden-shifting framework by showing that (i) the employee "was at least 40; (ii) her work was sufficient to meet the employer's legitimate expectations; (iii) her employer took adverse action against her; and (iv) either younger persons were retained in the same position upon her termination or the employer did not treat age neutrally in taking the adverse action." *Del Valle-Santana v. Servicios Legales de P.R., Inc.*, 804 F.3d 127, 129–30 (1st Cir. 2015). "This showing gives rise to an inference that the employer discriminated due to the plaintiff's advanced years." *Mesnick v. General Electric Co.*, 950 F.2d 816, 823 (1st Cir. 1991).

After the plaintiff has shown a prima facie case of discrimination, the burden shifts to the defendant-employer to articulate "a legitimate, nondiscriminatory reason for the adverse employment decision." *Id.*; *see Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 720 (1st Cir. 1994) ("[T]he employer merely must set forth, through the introduction of admissible evidence, reasons

---

[4] Zabala does not contend that any of the evidence he has proffered qualifies as "direct evidence" of discrimination. *See, e.g.*, *Melendez-Arroyo v. Cutler-Hammer de P.R. Co.*, 273 F.3d 30, 35 (1st Cir. 2001) (direct evidence "normally contemplates only those statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision") (internal quotations omitted). And because both parties have proceeded under the Supreme Court's *McDonnell Douglas* burden-shifting framework in arguing for their respective positions, Zabala's claims will be evaluated under that framework.

for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." (internal quotations omitted)). "This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times." *Mesnick*, 950 F.2d at 823.

If the employer satisfies this burden, "the focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." *Gómez–González v. Rural Opportunities, Inc.*, 626 F.3d 654, 662 (1st Cir. 2010) (internal quotation mark omitted). "At the summary judgment stage, the plaintiff need not prove his case, but must proffer sufficient evidence to raise a genuine issue of material fact as to whether he" suffered an adverse action "because of his age." *Adamson v. Walgreens Co.*, 750 F.3d 73, 78–79 (1st Cir. 2014) (citing *Domínguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000)).

In this case, Sanofi assumed "for the purposes of the instant dispositive motion" that Zabala could establish a prima facie case of age discrimination. Docket No. 55 at 5. Having conceded that Zabala could carry his initial burden, I will move on to the second step of the *McDonnell Douglas* burden-shifting test: whether Sanofi has set forth a legitimate non-discriminatory reason for terminating Zabala's employment.

Sanofi contends that Zabala was terminated for a legitimate, nondiscriminatory reason: following the consolidation of two jobs into one, Sanofi chose the other candidate over Zabala because of her superior performance ratings in the past three years as well as her greater experience in managing and marketing diabetes products, which represented the vast majority of the responsibilities of the new position. Docket No. 55 at 6, 8, 11-12. This is surely a legitimate and nondiscriminatory reason that satisfies Sanofi's burden of production. *See, e.g.*, *Davila v. Corporacion de Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 16 (1st Cir. 2007) (plaintiff fired for poor work performance); *Woodman v. Haemonetics Corp.*, 51 F,3d 1087, 1092 (1st Cir. 1995) (legitimate reason to fire plaintiff was that while he had excellent work performance in prior position, he never "mastered the tasks required" in his new position). Moreover, Zabala concedes

that if its reasons were true, Sanofi would have proffered a legitimate, nondiscriminatory reason for his termination and the selection of Bonet over him for the new Business Unit Marketing Manager position. Docket No. 63 at 20. Sanofi having proffered a legitimate, nondiscriminatory reason for Zabala's termination, the spotlight returns to Zabala, who must show that this reason is a pretext for age-based discrimination.

In this third and final stage of the burden-shifting framework, "the *McDonnell Douglas* framework falls by the wayside," *Mesnick*, 950 F.2d at 824, and the court's focus turns to the "ultimate issue": whether, after assessing all the record evidence in the light most favorable to Arroyo, he has raised a genuine dispute of material fact as to whether his suspension was on account of discriminatory animus. *See Acevedo-Parrilla*, 696 F.3d at 140. To meet this burden, Arroyo "must offer some minimally sufficient evidence, direct or indirect, both of pretext and of [IPR's] discriminatory animus." *Mesnick*, 950 F.2d at 825; *see also Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000) ("courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent"). In making this showing, an employee may proffer the "same evidence" to "show both that the employer's articulated reason . . . is a pretext and that the true reason is discriminatory." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56–57 (1st Cir. 1999).

An employee may bring to the fore "comments by the employer which intimate a [discriminatory] mindset," *Mesnick*, 950 F.2d at 828, as well as "different and arguably inconsistent explanations" for the employer's actions. *Domínguez-Cruz*, 202 F.3d at 432. "'[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions'" in the employer's proffered reason can also "do the trick." *Collazo-Rosado v. Univ. of P.R.*, 765 F.3d 86, 93 (1st Cir. 2014). But pretext is not established by merely impugning the veracity of the employer's proffered reason or by showing that the employer's perception was incorrect. *See Ponte v. Steelcase Inc.*, 741 F.3d 310, 323 (1st Cir. 2014) (to show pretext, it is insufficient for "a plaintiff to 'impugn the veracity' of the employer's proffered reason"); *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 177 (1st Cir. 2008) ("If there is no proof of discriminatory animus on the part of a

decisionmaker, a plaintiff must show more than that the decisionmaker's perception was incorrect"); *Mesnick*, 950 F.2d at 825 ("Courts may not sit as super personnel departments, assessing the merit—or even rationality—of employers' nondiscriminatory business decisions.").

Zabala does not challenge Sanofi's decision to consolidate the Diabetes Business Unit and the Specialty Business Unit. *See generally* Docket Nos. 63, 82. Instead of challenging the reduction in force or Sanofi's decision to pick the most qualified candidate, Zabala argues that the only reason that Bonet was identified as the most qualified candidate, rather than Zabala, was because of his age. *Id*. Consequently, Zabala must show "evidence from which the trier of fact reasonably could conclude that [Zabala]'s abilities and qualifications were equal or superior to employees who were retained." *Goldman v. First Nat. Bank of Boston*, 985 F.2d 1113, 1119 (1st Cir. 1993).

Zabala presents many arguments for how Sanofi's actions evince pretext and discriminatory intent, but "[t]he patchwork of circumstantial evidence presented by [Zabala] fails to limn pretext, let alone discriminatory intent." *Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 15 (1st Cir. 1998). Zabala's first argument can be broken down into two parts: the selection criteria that Freeman and Bury chose were carefully and retroactively selected to ensure that their pre-chosen candidate, Bonet, would appear more qualified than Zabala, and their method of applying the selection criteria was so flawed that it shows that Sanofi's true criteria for choosing Bonet over Zabala was that she is eleven years younger than him. Docket No. 63 at 7-9. Zabala provides little evidence to support his argument that the selection criteria themselves were a cover-up other than the fact that Freeman openly wrote down that he thought Bonet should be chosen for the job before he and Bury concluded their assessment of each candidate's merits. *Id*. While it is uncontested that Freeman preferred Bonet as a candidate, it is also uncontested that he preferred her "because of her expertise in diabetes and proven record and capabilities in the diabetes market." SUF ¶ 125. A preference for one candidate over another in and of itself does not evince pretext but a normal hiring process. The relevance of extensive experience with diabetes products is further bolstered by the fact that when the opportunity arose to replace Bonet as the Marketing Manager, Sanofi again hired someone with considerable experience in marketing diabetes products, indicating that

experience in diabetes products really was a requirement of the position. See SUF ¶¶ 163-65; OSF ¶ 147.

Zabala also argues that the fact that Sanofi did not use the same selection criteria for other positions shows that the criteria was pretext for discrimination. Docket No. 63 at 9. Specifically, he points out that experience with diabetes products was not the decisive factor in hiring Freeman as the General Manager (as he did not have any) or Hernandez as the new Product Manager (as his competitor, Dulce Flores, had more experience with diabetes products). *Id*. While these facts are true, Zabala's argument is fundamentally flawed: the law does not require that companies employ the same selection criteria for different jobs. *See Schultz v. Goldbelt Glacier Health*, 713 F. App'x 121, 129 (3d Cir. 2017 (the fact that the Air Force had different and less rigorous job requirements for one position than another was not evidence of job discrimination); *Garrison v. Gambro, Inc.*, 428 F.3d 933, 938 (10th Cir. 2005 ("[E]mployers, not employees or courts, are entitled to define the core qualifications for a position, so long as the criteria utilized by the company are of a nondiscriminatory nature." (internal quotation omitted)). Furthermore, it is simply not logical to require an employer to have the same job qualifications for a General Manager and a low-level marketing employee as for a person in charge of marketing diabetes products.

Zabala's arguments that the method of applying the selection criteria was pretext for discrimination are equally unavailing. For instance, Zabala argues that the fact that Freeman and Bury only focused on recent performance evaluations—and specifically just on the overall performance score rather than the lengthier reviews—shows pretext because they did not place appropriate emphasis on his many accolades and performance successes from earlier in his career when he was managing the cardiovascular products.[5] *See* OSF ¶ 130 ("It is obvious that David Freeman and Andrea Bury limited the comparison to the last three years who Hector Zabala's

---

[5] Zabala also criticizes the performance evaluation rating system itself, but the evaluations were conducted by his supervisor, not by the people responsible for terminating his employment, and the courts have held that an employee's beliefs of his own merits are not relevant to a claim of pretext. *See* SUF ¶ 51; *Shorette*, 155 F.3d at 15 ("Although Shorette disputed these assessments, his personal opinion regarding his own job qualifications is not sufficiently probative on the issue of pretext.").

products under his care had lost the luster and importance of previous blockbusters he successfully managed for many years and Brenda Bone's product took the lead. Otherwise, he would have surpassed Brenda Bone's experience by far."). However, it is not for the courts to second-guess an employer's business judgments, and Zabala offers no case law that suggests that using the most recent four years of performance evaluations rather than the last ten or more years of performance evaluations shows pretext for discrimination. *See Mesnick*, 950 F.2d at 825; *Sagar v. Oracle Corp.*, 914 F. Supp. 2d 688, 695 (D. Md. 2012), *aff'd*, 523 F. App'x 999 (4th Cir. 2013) (plaintiff's argument that only looking at the past two fiscal quarters "was unfair considering his 'superb' performance *prior* to the evaluation periods in question" was not persuasive because it is not the place of the court to question the "business judgment of defendant's employees and managers" (internal quotations omitted)). Just because a lengthier evaluation process may have cast Zabala in a more favorable light does not make the process itself discriminatory.

Furthermore, even assuming, as Zabala argues, that it was improper of Bury to consider the not yet finalized 2013 evaluations of both candidates, Zabala has presented no evidence that the choice to do so represented age discrimination, especially since his 2013 review actually increased his average performance review score and decreased Bonet's. *See* Docket No. 63 at 9; SUF ¶¶ 52-62, 65-67, 69, 72 (Zabala's performance review scores were, chronologically, seven, five, one, and four, and Bonet's performance review scores were, chronologically, four, eight, eight, and five).[6]

Zabala also argues that using experience in marketing diabetes products as a criteria was unfair and, even if it was appropriate, that Freeman and Bury did not properly consider Zabala's experience and ability to learn. Zabala's first argument essentially boils down to the fact that it was unfair for Freeman and Bury to focus on who had more expertise in the diabetes market because they knew that Bonet would be more qualified: she "had already occupied the position of

---

[6] Zabala alleges that the 2013 performance reviews deviated from the 2012 performance reviews, Docket No. 82 at 3-4, but the templates appear to be the same. *Compare* Docket No. 54-15, *with* Docket No. 54-17.

Marketing Manager for Sanofi Diabetes Business Unit for a number of years" while Zabala had never held that position and consequently had less experience with marketing diabetes products. Docket No. 63 at 9. As it is uncontested that diabetes products constituted a vast majority of Sanofi PR's sales and marketing in 2013—and consequently would also constitute the bulk of the work for the new Business Unit Marketing Manager—it seems logical that Sanofi would prioritize experience in marketing diabetes products specifically. *See* SUF ¶¶ 40, 76, 90; OSF ¶ 40. Unsurprisingly, Zabala points to no case law that supports his contention that an employer may not consider a relevant job qualification because it would favor one candidate over another. Accordingly, this argument is fruitless. Zabala's second argument is that he, too, had experience with diabetes products and had shown himself to be a fast learner, and therefore the fact that Bonet was chosen over him was age discrimination. Docket No. 63 at 13-14. This argument can be quickly disposed of because the question is not whether Zabala was qualified but whether Bonet was *more* qualified, and Zabala never argues that he had more experience with diabetes products than Bonet (and in fact seems to concede that she did in his argument that experience with diabetes products should not have been considered). *See Frankina v. First Nat. Bank of Boston*, 991 F.2d 786 (1st Cir. 1993) (the reason for plaintiff's discharge "was not that his performance was unsatisfactory in an absolute sense, but that he was the least qualified employee in the Control Unit").

Continuing in the selection process, Zabala next argues that Freeman's choice to ask Febles to write a comparison of Bonet and Zabala was pretext for his discriminatory intent because Febles knew more information about Bonet than she did Zabala. *See* Docket No. 63 at 13-15. Freeman asked Febles (Bonet's direct supervisor) to prepare a comparison of Zabala and Bonet, focusing on their background and experience. SUF ¶ 127. Febles emailed Freeman her comparison of the two candidates on November 21, 2013; the comparison was very detailed and favorable as to Bonet and occasionally incorrect and under inclusive as to Zabala. SUF ¶¶ 129-31; OSF ¶ 130. While it was perhaps a mistake to ask someone with disproportionate personal knowledge about one candidate over another to conduct an evaluation between them was perhaps a mistake, this was a

Zabala-de Jesus, *et al*. v. Sanofi Aventis Puerto Rico, Inc., *et al*., Civil No. 15-1803 (BJM)                                   16

managerial decision by Freeman. Perhaps it reflected the fact that Freeman wanted Bonet to get the job because he had already identified her as the candidate with the most relevant experience. Or, perhaps he had a better relationship with Febles than he did with Zabala's supervisor, Rodriguez. Or, perhaps he asked Febles to do the comparison as opposed to Rodriguez because he knew that they were shortly going to terminate Rodriguez's employment in favor of Febles. Or, as Zabala argues, it could have been because he did not want Zabala to get the job. However, Zabala has produced no evidence to boost Zabala's belief from a speculative guess like the others into a genuine dispute of material fact. At this stage, the court may not simply rely on Zabala's assurances that age discrimination motivated Freeman's choices. *See Ponte v. Steelcase Inc.*, 741 F.3d 310, 323 (1st Cir. 2014) (to show pretext, it is insufficient for "a plaintiff to 'impugn the veracity' of the employer's proffered reason").

Relatedly, Zabala argues that the fact that Febles and Freeman listed the respective ages of Bonet and Freeman in the comparison email sent to Bury is evidence of discrimination. As Zabala explains, Freeman should have known better than to include Bonet's and Zabala's age in the comparison email "unless that was intentionally placed as another element against choosing Hector Zabala for this position." OSF ¶ 139. In Febles's original email to Freeman, she included that Bonet is a woman over 40 years old but did not reference Zabala's gender or age. SUF ¶ 134. She explained in her deposition that she thought it was relevant that Bonet was a member of two protected classes; however, she did not know Zabala's age. SUF ¶¶ 134-35. When Freeman forwarded the information to Bury, he changed Febles's note from woman to female and added under Zabala's description that he is a male over 50. SUF ¶ 139. As Sanofi argues, though, courts have been clear that a mere passing reference to someone's protected status, when not done in a preferential way, is not evidence of pretext. *See Alberti v. Univ. of Puerto Rico*, 818 F. Supp. 2d 452, 479 (D.P.R. 2011), *aff'd sub nom. Alberti v. Carlo-Izquierdo*, 548 F. App'x 625 (1st Cir. 2013) ("Reference to protected status without reflecting bias is not evidence of discrimination.") (citing *Elam v. Regions Financial Corp.*, 601 F.3d 873, 878 (8th Cir. 2010) (reference in email to plaintiff's pregnancy "reminds human resources personnel that this employee issue not only

Zabala-de Jesus, *et al*. v. Sanofi Aventis Puerto Rico, Inc., *et al*., Civil No. 15-1803 (BJM)                    17

involved the various performance issues but must be evaluated with due regard to the employee's protected status under the law" and thus constituted a "stray remark")). Here, Zabala has presented no evidence that the reference to Bonet and Febles's ages was anything other than a stray remark reminding human resources that both employees were protected by the ADEA.

Finally, Zabala takes issue with the fact that he was never offered the position of Business Intelligence Manager and that Freeman did not in fact consider him for the position. Docket No. 63 at 16; OSF ¶ 112 (Freeman intended "to discriminate against Hector Zabala because of his age knowing that he was one of the only two persons that would be discharged in the reorganization and did not consider him for this new position . . . He did not offer Hector Zabala this opportunity for growth within the Company."). It is uncontested that Zabala did not apply for the position. SUF ¶ 112. Failing to offer an employee a job that they did not apply for is not evidence of discriminatory intent: "employers face no . . . obligation" to offer "transfers or relocations" when conducting a reduction in force. *Pages-Cahue v. Iberia Lineas Aereas de Espana*, 82 F.3d 533, 539 (1st Cir. 1996); *see Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 374 (6th Cir. 1999) ("[A]n employer has no duty to transfer an employee to another position within the company when the employer reduces the work force for economic reasons.").

In conclusion, there is no dispute that under the selection criteria selected by Freeman and Bury, Bonet was the more qualified candidate: she had higher performance evaluation scores and more experience with marketing diabetes products. Having failed to show that his relevant "abilities and qualifications were equal to employees who were retained[,] . . . whatever slight shadow of doubt may have been cast upon the proffered justification for his dismissal is too faint to raise the spectre of pretext." *Goldman*, 985 F.2d at 1119.

In its motion for summary judgment, Sanofi also argues that Zabala does not have a claim for a hostile work environment under the ADEA. As Zabala's complaint does not allege that he faced a hostile work environment and he did not respond to Sanofi's hostile work environment arguments in his reply or sur-reply, Zabala waived any hostile work environment claim he may have had. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a

perfunctory manner [or not at all], unaccompanied by some effort at developed argumentation, are deemed waived.").

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is **GRANTED**. Zabala's claim is **DISMISSED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of July 2018.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge